IN THE UNITED STATES DISTRIC COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE GLUCAGON-LIKE PEPTIDE-1 RECEPTOR AGONISTS (GLP-1 RAS) PRODUCTS LIABILITY LITIGATION | MDL NO. 3094

THIS DOCUMENT RELATES TO ALL CASES

JUDGE KAREN SPENCER MARSTON |
| RHONDA GIDNEY,

     Plaintiff,

v.

NOVO NORDISK INC. and NOVO NORDISK A/S,

     Defendants. | COMPLAINT AND JURY DEMAND

CIVIL ACTION NO.: _____ |

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff files this First Amended Complaint pursuant to the Direct Filing Order and is to be bound by the rights, protections and privileges, and obligations of that Direct Filing Order and other Orders of the Court. Further, in accordance with the Direct Filing Order, Plaintiff hereby designates the United States District Court of Massachusetts, Eastern Division, as Plaintiff's designated venue ("Original Venue"). Plaintiff makes this selection based upon one (or more) of the following factors:

  X  Plaintiff currently resides in Orleans, Vermont.

  X  Plaintiff purchased Defendant(s)' products in Bellingham, Massachusetts and used Defendant(s)' products in Wrentham, Massachusetts.

  __  The Original Venue is a judicial district in which Defendant _____ resides, and all Defendants are residents of the State in which the district is located (28 USC § 1391(b)(1)).

  X  The Original Venue is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, specifically (28 USC § 1391(b)(2)): <u>Plaintiff</u>

resided in Original Venue at the time she purchased and used GLP-1 RAs, and she purchased and used GLP-1 RAs in Original Venue.

__ There is no district in which an action may otherwise be brought under 28 USC § 1391, and the Original Venue is a judicial district in which Defendant _____ is subject to the Court's personal jurisdiction with respect to this action (28 USC § 1391(b)(3)).

__ Other reason (please explain): _____.

## NATURE OF THE CASE

1.    This is an action for damages suffered by Plaintiff, Rhonda Gidney, who was severely injured as a result of Plaintiff's use of Ozempic, an injectable prescription medication that is used to control blood sugar in adults with type 2 diabetes and promote weight loss.

2.    This case involves claims of negligence, failure to warn, design defect, negligent misrepresentation and marketing, and violations of the unfair and deceptive trade practices by Defendants in designing, distributing, marketing, supplying, warranting, and/or selling Ozempic by the Defendants directly or through their agents, apparent agents, servants, and/or employees.

3.    For approximately a decade, Defendants advertised and marketed Ozempic, their once weekly injection of semaglutide, a GLP-1 (glucagon-like peptide-1) receptor agonist (GLP-1 RA), as safe and effective to treat obesity and diabetes while concealing the true and dangerous side effects of this product from prescribing physicians and consumers.

4.    An agonist is a manufactured substance that attaches to a cell receptor and causes the same action as the naturally occurring substance.[1] GLP-1 agonists bind to GLP receptors to trigger the effects or roles of the GLP-1 hormone, a hormone in the lower gastrointestinal tract which helps to control insulin response levels after eating and slows gastric emptying.[2]

---

[1] https://www.cancer.gov/publications/dictionaries/cancer-terms/def/agonist (last visited March 4, 2024).
[2] https://pubmed.ncbi.nlm.nih.gov/9840447/#:~:text=Glucagon%2Dlike%20peptide%201%20(GLP%2D1)%20is%20a,glucose%20administration%20in%20normal%20humans. (last visited March 4, 2024).

5. GLP-1 agonists are able to trigger the effects or roles of the GLP-1 hormone, making them the active ingredient in a class of medications that can help lower blood sugar levels and promote weight loss.[3]

6. The higher the dose of the GLP-1 agonist, the more extreme the effects.[4]

7. Defendants did not warn about the true and dangerous side effects including but not limited to acute and chronic gastrointestinal issues, deep vein thrombosis, sarcopenia, malnutrition, compromised body composition, hospitalization, and death.

8. Defendants did not warn about the true and dangerous side effects including but not limited to increased weight gain after cessation of medication.

9. Defendants did not warn about the true and dangerous side effects including alteration of fat, muscle and body composition.

10. Despite Defendants' knowledge of the foreseeable risks and unreasonably dangerous nature of Ozempic, Defendants designed and brought the product to market and continued to market the drug when there were safer alternatives available, including but not limited to alternate dosing and reduced exposure.

11. Defendants acknowledge that gastrointestinal events are well known side effects of the GLP-1RA class of drugs.[5] However, Defendants have downplayed the severity of the gastrointestinal events caused by their GLP-1RAs, never, for example, warning of the risk of gastroparesis ("paralyzed stomach") and its sequalae.

12. Gastroparesis is a condition that affects normal muscle movement in the stomach. Ordinarily, strong muscular contractions propel food through the digestive tract. However, in a

---

[3] https://my.clevelandclinic.org/health/treatments/13901-glp-1-agonists (last visited Feb. 28, 2024)
[4] *Id.*
[5] CT Jones, *Ozempic Users Report Stomach Paralysis from Weight Loss Drug: 'So Much Hell'*, Rolling Stone (July 25, 2023), available at https://www.rollingstone.com/culture/culture-news/ozempic-stomach-paralysis- weight-loss-side-effects-1234794601/ (visited on 10/2/24).

person suffering from gastroparesis, the stomach's motility is slowed down or does not work at all, preventing the stomach from emptying properly. Gastroparesis can interfere with normal digestion and cause nausea, vomiting (including vomiting of undigested food), abdominal pain, abdominal bloating, severe dehydration, a feeling of fullness after eating just a few bites, undigested food hardening and remaining in the stomach, acid reflux, changes in blood sugar levels, lack of appetite, weight loss, malnutrition, and a decreased quality of life. There is no cure for gastroparesis.[6]

13. Despite Defendant's knowledge of these dangerous side effects, Defendant failed to warn the public and the medical community, including Plaintiff and Plaintiff's health care providers, of these risks, while also continuing to over-promote the medications and spend millions of dollars per year to market the medications as safe and effective.

14. Defendants' affirmative misrepresentations and omissions regarding the true and dangerous side effects of Ozempic, concealed from Plaintiff and Plaintiff's healthcare providers information necessary to properly weigh the benefits and risks associated with Ozempic and to properly consider alternative treatment options.

15. As a result of Defendants' failure to properly warn the public and medical community of the actual risks of Ozempic, as well as Defendants' aggressive marketing of Ozempic, consumers have suffered and continue to suffer from acute injuries, such as intestinal blockages and deep vein thrombosis, as well as chronic injuries, such as gastroparesis, sarcopenia, and compromised body composition.

16. Plaintiff Rhonda Gidney brings this action for personal injuries suffered as a proximate result of her Ozempic use. Plaintiff seeks compensatory damages, statutory damages, attorney's

---

[6] *Gastroparesis*, Mayo Clinic (June 11, 2022), available at https://www.mayoclinic.org/diseases-conditions/gastroparesis/symptoms-causes/syc-20355787 (visited on 10/2/24).

fees and costs, and all other available remedies provided to Plaintiff under the law as a result of her injuries.

## PARTIES

17. Plaintiff Rhonda Gidney is a resident and citizen of Orleans, Vermont.

18. At the time Plaintiff Rhonda Gidney was prescribed Ozempic, used Ozempic, and was diagnosed with injuries as a result of her Ozempic use, she was a resident and citizen of Wrentham, Massachusetts.

19. Defendant Novo Nordisk Inc. is a Delaware corporation with its principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08538. Novo Nordisk has conducted business and derived substantial revenue from within the Commonwealth of Massachusetts, including within the area covered by the Original District, and generated substantial revenue as a result.

20. Defendant Novo Nordisk A/S is a public limited liability company organized under the laws of Denmark with its principal place of business in Bagsvaerd, Denmark.

21. The aforementioned Novo Nordisk entities are collectively referred to herein as "Defendants" and "Novo Nordisk" and "Novo Nordisk Defendants."

## JURISDICTION AND VENUE

22. The Original Venue has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a) because there is complete diversity between Plaintiff and Defendants, and because the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000) exclusive of interest and costs. Plaintiff was a resident of the Commonwealth of Massachusetts at the time this cause of action accrued. Each Defendant is neither incorporated nor has its principal place of business in Massachusetts.

23. The Original Venue has personal jurisdiction over Defendants because at all relevant times Defendants have engaged in substantial business activities in the Commonwealth of Massachusetts. At all relevant times, Defendants transacted, solicited, and conducted business within the Commonwealth of Massachusetts. Plaintiff's claims arise out of Defendants' transaction of business and their tortious acts within the Commonwealth of Massachusetts, from which they realized pecuniary benefit.

24. The Original Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in Massachusetts.

25. Pursuant to MDL No. 3094 (24-md-3094) Case Management Order No. 14, any plaintiff whose action would be subject to transfer to the aforementioned MDL may file their case directly in the MDL in the United States District Court for the Eastern District of Pennsylvania ("Transfer Venue").

## FACTUAL BACKGROUND

A.    FDA'S Approval of Ozempic

26. On December 5, 2016, the Novo Nordisk Defendants announced submission of a new drug application (NDA) to the FDA for regulatory approval of once-weekly injectable semaglutide, a new glucagon-like peptide-1 (GLP-1) medication for treatment of type 2 diabetes. In the announcement, Defendants represented that in clinical trials "once-weekly semaglutide had a safe and well tolerated profile with the most common adverse event being nausea."[7]

27. On December 5, 2016, Defendant Novo Nordisk Inc. submitted NDA 209637, requesting that the FDA grant it approval to market and sell Ozempic (semaglutide) 0.5 mg or 1 mg

---

[7] Novo Nordisk, *Novo Nordisk files for regulatory approval of once-weekly semaglutide in the US and EU for the treatment of type 2 diabetes* (Dec. 5, 2016) available at https://ml.globenewswire.com/Resource/Download/ d2f719e1-d69f-4918-ae7e-48fc6b731183 (last visited on 8/24/23).

injection in the United States as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus. On December 5, 2017, the FDA approved NDA 209637.[8]

28. On March 20, 2019, Defendant Novo Nordisk Inc. submitted supplemental new drug application (sNDA) 209637/S-003 for Ozempic (semaglutide) 0.5 mg or 1 mg injection, requesting approval to expand its marketing of Ozempic by adding an indication to reduce the risk of major adverse cardiovascular events in adults with type 2 diabetes and established cardiovascular disease.[9] On January 16, 2020, the FDA approved sNDA 209637/S-003.[10]

29. On May 28, 2021, Defendant Novo Nordisk Inc. submitted sNDA 209637/S-009, requesting approval for a higher 2 mg dose of Ozempic (semaglutide) injection. On March 28, 2022, the FDA approved sNDA 209637/S-009.[11]

30. On March 28, 2022, the Novo Nordisk Defendants announced the FDA's approval of sNDA 209637/S-009 for a higher 2 mg dose of Ozempic (semaglutide) injection. In the press release, Defendants represented Ozempic as having "proven safety" and advertised that "plus it can help many patients lose some weight."[12] As with its prior press releases, Defendants disclosed Important Safety Information and a provided link to the Medication Guide and Prescribing Information, but gastroparesis was not identified as a risk.

---

[8] FDA Approval Letter for NDA 209637 (Ozempic) available at https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2017/209637s000ltr.pdf (last visited on 8/24/23).
[9] *Novo Nordisk files for US FDA approval of oral semaglutide for blood sugar control and cardiovascular risk reduction in adults with type 2 diabetes*, Cision PR Newswire (March 20, 2019) available at https://www.prnewswire.com/news-releases/novo-nordisk-files-for-us-fda-approval-of-oral-semaglutide-for-blood-sugar-control-and-cardiovascular-risk-reduction-in-adults-with-type-2-diabetes-300815668.html (last visited on 8/24/23).
[10] FDA Supplement Approval Letter for NDA 209637/A-003 (Ozempic) available at https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2020/209637Orig1s003ltr.pdf (last visited on 8/24/23).
[11] FDA Supplement Approval Letter for NDA 209637/S-009 (Ozempic) available at https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2022/209637Orig1s009ltr.pdf (last visited on 8/24/23).
[12] *Novo Nordisk receives FDA approval of higher-dose Ozempic® 2 mg providing increased glycemic control for adults with type 2 diabetes*, Cision PR Newswire (March 28, 2022) available at https://www.prnewswire.com/news-releases/novo-nordisk-receives-fda-approval-of-higher-dose-ozempic-2-mg-providing-increased-glycemic-control-for-adults-with-type-2-diabetes-301512209.html (last visited on 8/24/23).

**B.      Defendants' Marketing and Promotion of Ozempic**

31. On December 5, 2017, Defendants announced the FDA's approval of Ozempic (semaglutide) 0.5 mg or 1 mg injection in a press release stating that: "Novo Nordisk expects to launch OZEMPIC® in the U.S. in Q1 2018, with a goal of ensuring broad insurance coverage and patient access to the product. OZEMPIC® will be priced at parity to current market-leading weekly GLP-1 RAs and will be offered with a savings card program to reduce co-pays for eligible commercially-insured patients. Additionally, as part of the access strategy, Novo Nordisk is working with appropriate health insurance providers to establish innovative contracting solutions."[13]

32. On February 5, 2018, Defendants announced that they had started selling Ozempic in the United States and touted the medication as a "new treatment option[]" that "addresses the concerns and needs of people with diabetes[.]" Defendants offered an "Instant Savings Card to reduce co-pays to as low as $25 per prescription fill for up to two years."[14]

33. Defendants promoted the safety and sale of Ozempic in the United States on its websites, in press releases, through in-person presentations, through the drug's label, in print materials, on social media, and through other public outlets.

34. On July 30, 2018, Defendants launched their first television ad for Ozempic to the tune of the 1970s-hit pop song "Magic" by Pilot wherein Defendants advertised that "adults lost on average up to 12 pounds" when taking Ozempic, even though it is not a weight loss drug.[15]

---

[13] *Novo Nordisk Receives FDA Approval of OZEMPIC® (semaglutide) Injection For the Treatment of Adults with Type 2 Diabetes*, Cision PR Newswire (December 05, 2017), available at https://www.prnewswire.com/news-releases/novo-nordisk-receives-fda-approval-of-ozempic-semaglutide-injection- for-the-treatment-of-adults-with-type-2-diabetes-300567052.html (last visited on 8/24/23).

[14] *Novo Nordisk Launches Ozempic® and Fiasp®, Expanding Treatment Options for Adults with Diabetes*, Cision PR Newswire (February 05, 2018) available at https://www.prnewswire.com/news-releases/novo-nordisk-launches-ozempic-and-fiasp-expanding-treatment-options- for-adults-with-diabetes-300592808.html (last visited on 8/24/23).

[15] *Ozempic TV Spot, 'Oh!'*, iSpot.tv (July 30, 2018) available at https://www.ispot.tv/ad/d6Xz/ozempic-oh (last visited on 8/24/23).

35. Over the next five years, Defendants spent $884,000,000 on running television ads in the United States to promote its semaglutide drugs (Ozempic, Wegovy and Rybelsus) with the majority of the spending allocated specifically to advertising Ozempic.[16]

36. On July 6, 2023, it was reported that Defendants had spent $11,000,000 on food and travel for doctors as part of Defendants' efforts to promote Ozempic.[17]

37. As a result of Defendants' advertising and promotion efforts, Ozempic has been widely used throughout the United States. The number of prescriptions filled reached an all-time high of 373,000 in one week in February of 2023, with more than half of those being new prescriptions.[18] In June 2023, it was reported that new prescriptions for Ozempic had surged by 140 percent from the prior year.[19]

38. On TikTok, the hashtag #Ozempic had 273 million views as of November 22, 2022,[20] and currently has over 1.2 billion views.[21]

39. On June 15, 2023, a news report was published about the "thousands of weight-loss ads on social media for the drugs Ozempic and Wegovy." And while many of those ads were found to be from online pharmacies, as of June of 2023 Defendants were still running online social-media ads for its semaglutide products despite claiming in May that it would stop running ads

---

[16] Ritzau, *Novo Nordisk runs TV ads in US for multimillion-dollar sum*, MedWatch (April 26, 2023) available at https://medwatch.com/News/Pharma___Biotech/article15680727.ece (last visited on 8/24/23).

[17] Zadikian M, Khemlani A (Transcript of Video), *Novo Nordisk spent $11 million on Ozempic promotion*, Yahoo Finance (July 6, 2023) available at https://finance.yahoo.com/video/novo-nordisk-spent-11-million-155418308.html (last visited on 8/24/23).

[18] Choi A, Vu H, *Ozempic prescriptions can be easy to get online. Its popularity for weight loss is hurting those who need it most*, CNN (March 17, 2023) available at https://www.cnn.com/2023/03/17/health/ozempic-shortage-tiktok-telehealth/ (last visited on 8/24/23).

[19] Gilbert D, *Insurers clamping down on doctors who prescribe Ozempic for weight loss,* The Washington Post (June 12, 2023) available at https://www.washingtonpost.com/business/2023/06/11/weight-loss-ozempic-wegovy-insurance/ (last visited on 8/24/23).

[20] Blum D, *What is Ozempic and Why Is It Getting So Much Attention?,* The New York Times (published Nov. 22, 2022, updated July 24, 2023) available at https://www.nytimes.com/2022/11/22/well/ozempic-diabetes-weight-loss.html (last visited on 8/24/23).

[21] https://www.tiktok.com/tag/ozempic (last visited on 8/24/23).

due to a shortage of the drug.[22]

40. On July 10, 2023, a global media company declared Ozempic as "2023's buzziest drug" and one of the "Hottest Brands, disrupting U.S. culture and industry."[23]

41. At all relevant times, Defendants were in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and/or distribute Ozempic.

**C. Defendants' Drugs Delay Gastric Emptying**

42. Semaglutide belongs to a class of medications known as glucagon-like peptide-1 receptor agonists (GLP-1 RAs).[24]

43. GLP-1 RAs mimic the activities of physiologic GLP-1, which is a gut hormone that activates the GLP-1 receptor in the pancreas to stimulate the release of insulin and suppress glucagon.[25]

44. At all relevant times, Defendants knew or should have known from published medical literature that non-pancreatic effects of GLP-1 include slowing of gastric emptying.[26]

45. It is well documented in the literature that GLP-1 RAs cause delayed gastric emptying. For example, a study published in October 2017 (before Defendants began marketing and selling their GLP-1 RA drugs) evaluated the effect of GLP-1 RAs on gastrointestinal tract motility and

---

[22] Ingram D, *More than 4,000 ads for Ozempic-style drugs found running on Instagram and Facebook*, NBC News (June 15, 2023) available at https://www.nbcnews.com/tech/internet/ozempic-weight-loss-drug-ads-instagram-wegovy- semaglutide-rcna88602 (last visited on 8/24/23).

[23] Bain P, *Ozempic was 2023's Buzziest Drug*, AdAge (July 10, 2023) available at https://adage.com/article/special-report-hottest-brands/ozempic-hottest-brands-most-popular-marketing-2023/2500571 (last visited on 8/24/23).
[24] Smits MM & Van Raalte DH (2021), *Safety of Semaglutide*, Front. Endocrinol., 07 July 2021, doi: 10.3389/fendo.2021.645563 (last visited on 8/24/23).
[25] Hinnen D, *Glucagon-Like Peptide 1 Receptor Agonists for Type 2 Diabetes*, 30(3) Diabetes Spectr., 202–210 (August 2017) available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5556578/ (last visited on 8/24/23).
[26] Deane AM et al., *Endogenous Glucagon-Like Peptide-1 Slows Gastric Emptying in Healthy Subjects, Attenuating Postprandial Glycemia*, 95(1) J Clinical Endo Metabolism, 225-221 (January 1, 2010) available at https://academic.oup.com/jcem/article/95/1/215/2835243 (last visited on 8/24/23); American Society of Anesthesiologists, *Patients Taking Popular Medications for Diabetes and Weight Loss Should Stop Before Elective Surgery, ASA Suggests* (June 29, 2023) available at https://www.asahq.org/about-asa/newsroom/news-releases/2023/06/patients-taking-popular-medications-for-diabetes-and-weight-loss-should-stop-before-elective-surgery (last visited on 8/24/23).

residue rates and explained that "GLP-1 suppresses gastric emptying by inhibiting peristalsis of the stomach while increasing tonic contraction of the pyloric region." The study authors concluded that the GLP-1 RA drug liraglutide "exhibited gastric-emptying delaying effects" and "the drug also inhibited duodenal and small bowel movements at the same time."[27]

46. As early as 2010, a study published in The Journal of Clinical Endocrinology & Metabolism indicated that that GLP-1 slows gastric emptying.[28]

47. Defendants knew or should have known of this risk of gastroparesis from the clinical trials.

48. Two subjects in the Wegovy phase 3 trial pool taking semaglutide 2.4 mg reported moderate adverse events of impaired gastric emptying and both subjects permanently discontinued treatment due to the adverse events. Three subjects also reported mild adverse events of impaired gastric emptying in the semaglutide run-in period of trial 4376.

49. The cardiovascular outcomes trials for Wegovy included two cases of gastroparesis with the first subject being diagnosed with severe gastroparesis after one month in the trial and second subject being diagnosed with gastroparesis after approximately two months in the trial.

50. On information and belief, Defendants not only knew or should have known that their GLP-1 RA drugs cause delayed gastric emptying with a risk of gastroparesis, but they may have sought out this effect due to its association with weight loss. For example, a recent study published in 2023 notes that "it has been previously proposed that long-acting GLP-1RAs could hypothetically contribute to reduced energy intake and weight loss by delaying GE [gastric

---

[27] Nakatani Y et al., *Effect of GLP-1 receptor agonist on gastrointestinal tract motility and residue rates as evaluated by capsule endoscopy*, 43(5) Diabetes & Metabolism, 430-37 (October 2017) available at https://www.sciencedirect.com/science/article/pii/S1262363617301076 (last visited on 8/24/23).

[28] Deane AM et al., *Endogenous Glucagon-Like Peptide-1 Slows Gastric Emptying in Healthy Subjects, Attenuating Postprandial Glycemia*, 95(1) J Clinical Endo Metabolism, 225-221 (January 1, 2010) available at https://academic.oup.com/jcem/article/95/1/215/2835243 (last visited on 8/24/23).

emptying]" and the study authors suggested "further exploration of peripheral mechanisms through which s.c. semaglutide, particularly at a dose of 2.4. mg/week, could potentially contribute to reduced food and energy intake."[29]

### D. The Medical Literature and Clinical Trials Gave Defendants Notice of Gastroparesis Being Causally Associated with Ozempic

51. Defendants further knew or should have known of the risk of gastroparesis from the published medical literature.

52. In August of 2020, medical literature advised that some "patients do not know they have diabetic gastroparesis until they are put on a glucagon-like peptide 1 (GLP-1) receptor agonist such as ... semaglutide ... to manage their blood glucose." The article went on to explain that "[t]his class of drugs can exacerbate the symptoms of diabetic gastroparesis. ... Thus, GLP-1 receptor agonist therapy is not recommended for people who experience symptoms of gastroparesis."[30]

53. In a September 2020 article funded and reviewed by Defendants, scientists affiliated with all Defendants reported on two global clinical trials that evaluated the effect of semaglutide in patients with cardiovascular events and diabetes.[31] More patients permanently discontinued taking oral semaglutide (11.6%) than placebo (6.5%) due to adverse events. The most common adverse events associated with semaglutide were nausea (2.9% with semaglutide versus 0.5% with placebo), vomiting (1.5% with semaglutide versus 0.3% with placebo), and diarrhea (1.4% with semaglutide versus 0.4% with placebo). Injectable semaglutide had a discontinuation rate of

---

[29] Jensterle M et al., *Semaglutide delays 4-hour gastric emptying in women with polycystic ovary syndrome and obesity*, 25(4) Diabetes Obes. Metab. 975-984 (April 2023) available at https://dom-pubs.onlinelibrary.wiley.com/doi/epdf/10.1111/dom.14944 (last visited on 8/24/23).

[30] Young CF, Moussa M, Shubrook JH, *Diabetic Gastroparesis: A Review*, Diabetes Spectr. (2020), Aug; 33(3): 290– 297, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7428659/ (last visited on 8/24/23).

[31] Mosenzon O, Miller EM, & Warren ML, *Oral semaglutide in patients with type 2 diabetes and cardiovascular disease, renal impairment, or other comorbidities, and in older patients*, Postgraduate Medicine (2020), 132:sup2, 37- 47, available at DOI:10.1080/00325481.2020.1800286 (last visited on 8/24/23).

11.5-14.5% versus placebo (5.7-7.6%) over a two-year period. The authors acknowledged the potential for severe gastrointestinal events, warning that "[f]or patients reporting severe adverse gastrointestinal reactions, it is advised to monitor renal function when initiating or escalating doses of oral semaglutide." For patients with other comorbidities, the study warned that "patients should be made aware of the occurrence of gastrointestinal AEs with GLP-1RAs."

54. A July 2021 article funded and reviewed by Defendants considered 23 randomized control trials conducted across the United States, Japan, and China and concluded that "gastrointestinal disturbances" were "well-known" side effects associated with semaglutide use.[32] When compared with placebos, the subcutaneous (injection) form of the drug induced nausea in up to 20% of patients (versus 8% on the placebo group), vomiting in up to 11.5% of patients (versus 3% in the placebo group) and diarrhea in up to 11.3% of patients (versus 6% in the placebo group). Overall, the percentage of patients experiencing adverse events that led to trial product discontinuation was greatest for GI-related adverse events, with some trials experiencing 100% discontinuation due to GI-related adverse events. The mean value of GR-related adverse events that led to discontinuation averaged 57.75%. Semaglutide appears to be associated with more frequent vomiting and nausea as compared to other GLP-1 RAs. The study acknowledges that while nausea and vomiting are unwanted side effects, "they may be partly responsible for aspects of the drug's efficacy."

55. An October 2021 article in the Journal of Investigative Medicine ("JIM") concluded that because gastroparesis can be associated with several medications, "[i]t is crucial to identify the causative drugs as discontinuation of the drug can result in resolution of the symptoms[.]"[33] In

---

[32] Smits MM & Van Raalte DH (2021), *Safety of Semaglutide*, Front. Endocrinol., 07 July 2021, doi: 10.3389/fendo.2021.645563 (last visited on 8/24/23).

[33] Kalas MA, Galura GM, McCallum RW, *Medication-Induced Gastroparesis: A Case Report*, J Investig Med High Impact Case Rep. 2021 Jan-Dec; 9: 2324709621051919 available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8529310/ (last visited on 8/24/23).

diabetics, making this determination can be particularly "tricky" because both diabetes and GLP-1 RAs can cause delayed gastric emptying. As such, "the timeline of drug initiation and symptom onset becomes of the upmost importance." The authors reviewed two case reports (discussed below) and concluded that history taking and making an accurate diagnosis of diabetic gastroparesis versus medication-induced gastroparesis is critical.

56. Case Report #1 in JIM involved a 52-year-old female with long-standing (10 years) well-controlled, type 2 diabetes who had been taking weekly semaglutide injections approximately one month prior to the onset of gastroparesis symptoms. The patient was referred with a 7-month history of post-prandial epigastric pain, accompanied by fullness, bloating, and nausea. A gastric emptying study showed a 24% retention of isotope in the patient's stomach at four hours, indicative of delayed gastric emptying. The patient discontinued semaglutide and her symptoms resolved after six weeks. The case report authors concluded that "thorough history taking revealed the cause [of gastroparesis] to be medication induced."[34]

57. Case Report #2 in JIM involved a 57-year-old female with a long-standing (16 years) type 2 diabetes who had been taking weekly dulaglutide injections (another GLP-1 RA) for 15 months and suffering from abdominal bloating, nausea, and vomiting for 12 of those months. A gastric emptying study showed 35% retention of isotope in the patient's stomach at four hours, indicating delayed gastric emptying. After discontinuing dulaglutide, the patient experienced a gradual resolution of symptoms over a four-week period.[35]

58. On June 29, 2023, the American Society of Anesthesiologists ("ASA") warned that

---

[34] Kalas MA, Galura GM, McCallum RW, *Medication-Induced Gastroparesis: A Case Report*, J Investig Med High Impact Case Rep. 2021 Jan-Dec; 9: 23247096211051919 available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8529310/ (last visited on 8/24/23).
[35] Kalas MA, Galura GM, McCallum RW, *Medication-Induced Gastroparesis: A Case Report*, J Investig Med High Impact Case Rep. 2021 Jan-Dec; 9: 23247096211051919 available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8529310/ (last visited on 8/24/23).

patients taking semaglutides and other GLP-1 RAs should stop the medication at least a week before elective surgery because these medications "delay gastric (stomach) emptying" and "the delay in stomach emptying could be associated with an increased risk of regurgitation and aspiration of food into the airways and lungs during general anesthesia and deep sedation."[36] The ASA also warned that the risk is higher where patients on these medications have experienced nausea and vomiting.

59. A July 25, 2023, article in Rolling Stone magazine, "*Ozempic Users Report Stomach Paralysis from Weight Loss Drug: 'So Much Hell'*", highlighted three patients who have suffered severe GI-related events, including gastroparesis, as a result of their use of GLP-1 RAs.[37] Patient 1 (female, age 37) reported incidents of vomiting multiple times per day and being unable to eat. The patient's physician diagnosed her with severe gastroparesis and concluded that her problems were caused and/or exacerbated by her use of a GLP-1 RA medication. Patient 2 (female) used Ozempic for one year and reported incidents of vomiting, including multiple times per day. The patient's physician diagnosed her with severe gastroparesis related to her Ozempic use. Patient 3 (female, age 42) experienced severe nausea both during and after she discontinued use of a GLP-1 RA. In a statement to Rolling Stone, Novo Nordisk acknowledged that "[t]he most common adverse reactions, as with all GLP-1s, are gastrointestinal related." Novo Nordisk further stated that while "GLP-1s are known to cause a delay in gastric emptying, ... [s]ymptoms of delayed gastric emptying, nausea and vomiting are listed as side effects." Novo Nordisk did not claim to have warned consumers about gastroparesis.

---

[36] American Society of Anesthesiologists, *Patients Taking Popular Medications for Diabetes and Weight Loss Should Stop Before Elective Surgery, ASA Suggests* (June 29, 2023) available at https://www.asahq.org/about-asa/newsroom/news-releases/2023/06/patients-taking-popular-medications-for-diabetes-and-weight-loss-should-stop- before-elective-surgery (last visited on 8/24/23).
[37] Jones CT, *Ozempic Users Report Stomach Paralysis from Weight Loss Drug: 'So Much Hell'*, Rolling Stone (July 25, 2023) available at https://www.rollingstone.com/culture/culture-news/ozempic-stomach-paralysis-weight-loss-side-effects-1234794601 (last visited on 8/24/23).

60. On July 25, 2023, CNN reported that patients taking Ozempic have been diagnosed "with severe gastroparesis, or stomach paralysis, which their doctors think may have resulted from or been exacerbated by the medication they were taking, Ozempic."[38] Additionally, "[t]he US Food and Drug Administration said it has received reports of people on the drugs experiencing stomach paralysis[.]"

61. Upon information and belief, at all relevant times, Defendants knew or should have known of the causal association between the use of GLP-1 RAs and the risk of developing gastroparesis. Defendants' actual and constructive knowledge derived from their clinical studies, case reports, medical literature, including the medical literature and case reports referenced above in this Complaint.

62. Upon information and belief, Defendants ignored the causal association between the use of GLP-1 RAs and the risk of developing gastroparesis.

63. Defendants' failure to disclose information that they possessed regarding the causal association between the use of GLP-1 RAs and the risk of developing gastroparesis, rendered the warnings for their medications inadequate.

**E. Defendants Failed to Warn of the Risk of Gastroparesis From Ozempic**

64. Gastroparesis is a disorder that slows or stops the movement of food from the stomach to the small intestine, even though there is no blockage in the stomach or intestines. Gastroparesis may also be called delayed gastric emptying.[39]

65. Symptoms of gastroparesis include nausea, vomiting, early satiation, postprandial fullness, bloating, and upper abdominal pain, which can be refractory and challenging to

---

[38] Goodman B, *They took blockbuster drugs for weight loss and diabetes. Now their stomachs are paralyzed,* CNN Health (July 25, 2023) available at https://www.cnn.com/2023/07/25/health/weight-loss-diabetes-drugs-gastroparesis (last visited on 8/24/23).

[39] Camilleri M, National Institute of Diabetes and Digestive and Kidney Diseases, *Gastroparesis*, available at https://www.niddk.nih.gov/health-information/digestive-diseases/gastroparesis (last visited on 8/24/23).

manage, leading to reduced quality of life and significant health care expenditure.[40]

66. Defendants' main promotional website for Ozempic (ozempic.com) includes a variety of information about the benefits of Ozempic relating to blood sugar, cardiovascular health, and weight loss, as well as "Important Safety Information" – however, Defendants do not disclose any risks causally associated with gastroparesis within the "Important Safety Information" section of their promotional website.

67. Similarly, the Prescribing Information discloses warnings, precautions, and adverse reactions causally associated with Ozempic, but it does not disclose the risk of gastroparesis. Instead, it discloses delayed gastric emptying under the "Drug Interaction" heading and notes that Ozempic "may impact absorption of concomitantly administered oral medications." Further, under the "Mechanism of Action" section, the Prescribing Information states that "[t]he mechanism of blood glucose lowering also involves a minor delay in gastric emptying in the early postprandial phase."[41] These statements do not disclose gastroparesis as a *risk* of taking Ozempic, nor do they disclose gastroparesis as a chronic condition that can result as a consequence of taking Ozempic.

68. None of Defendants' additional advertising or promotional materials warned prescription providers or the general public of the risk of gastroparesis.

69. News sources have identified the potential for serious side effects in users of Ozempic, including chronic motion sickness, leading to hospitalization.[42] For example, NBC News reported in January 2023 that some Ozempic users were discontinuing use because their

---

[40] Zheng T, Camilleri M, *Management of Gastroparesis*, Gastroenterology & Hepatology (Nov. 2021), Vol. 17, Issue 11, available at https://www.gastroenterologyandhepatology.net/archives/november-2021/management-of-gastroparesis/ (last visited on 8/24/23).
[41] Ozempic prescribing information, available at https://www.novo-pi.com/ozempic.pdf (last visited on 8/24/23).
[42] Min P, *Ozempic May Cause Potential Hospitalizations*, healthnews (June 26, 2023) available at https://healthnews.com/news/ozempic-may-cause-potential-hospitalizations/ (last visited on 8/24/23).

symptoms were unbearable.[43] One user said that five weeks into taking the medication she found herself unable to move off the bathroom floor because she had "vomited so much that [she] didn't have the energy to get up."[44] CNN recently reported that an Ozempic user diagnosed with gastroparesis vomits so frequently that she had to take a leave of absence from her teaching job.[45]

70. As noted above, as early as 2020, studies conducted on the safety of semaglutide identified the prevalence of gastrointestinal adverse effects, including nausea and vomiting. One study reported that gastrointestinal complaints are the main adverse-event related cause of drug discontinuation in phase-3 trials, suggesting that these "common side effects" are severe and persistent.[46]

71. Studies also identified a link between nausea induced by GLP-1RAs and weight loss, leading some authors to suggest that nausea and vomiting may play a role in the drug's efficacy.[47]

72. The Ozempic label lists nausea, vomiting, diarrhea, abdominal pain, and constipation as common adverse reactions reported in Ozempic patients but does not include vomiting in its "Warnings and Precautions" section, and it does not indicate a severity of risk. Gastroparesis is not mentioned at all.

---

[43] Nelson EL, *These Are the 5 Most Common Ozempic Side Effects, According to Doctors*, Best Life (April 3, 2023) available at https://bestlifeonline.com/ozempic-side-effects-news/ (last visited on 8/24/23).

[44] Bendix A, Lovelace B Jr., *What it's like to take the blockbuster drugs Ozempic and Wegovy, from severe side effects to losing 50 pounds*, NBC News (Jan. 29, 2023) available at https://www.nbcnews.com/health/health-news/ozempic- wegovy-diabetes-weight-loss-side-effects-rcna66493 (last visited on 8/24/23).

[45] Goodman B, *They took blockbuster drugs for weight loss and diabetes. Now their stomachs are paralyzed*, CNN (July 25, 2023) https://www.cnn.com/2023/07/25/health/weight-loss-diabetes-drugs-gastroparesis/index.html (last visited on 8/24/23).

[46] Mosenzon O, Miller EM, & Warren ML (2020) Oral semaglutide in patients with type 2 diabetes and cardiovascular disease, renal impairment, or other comorbidities, and in older patients, Postgraduate Medicine, 132:sup2, 37-47, DOI:10.1080/00325481.2020.1800286 (last visited on 8/24/23); *see also* Smits, MM & Van Raalte, DH (2021), *Safety of Semaglutide*, Front. Endocrinol., 07 July 2021, doi: 10.3389/fendo.2021.645563 available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8294388/ (last visited on 8/24/23).

[47] *Id*.

73. In January 2020, Defendants removed the "Instructions" portion from Section 17 "Patient Counseling Information" of the Ozempic label, which had instructed prescribers to "[a]dvise patients that the most common side effects of Ozempic are nausea, vomiting, diarrhea, abdominal pain and constipation." These instructions were present in the 2017 and 2019 labels.

74. In its section on "Females and Males of Reproductive Potential," the Ozempic label advises women users to discontinue Ozempic at least 2 months before a planned pregnancy due to the long washout period for semaglutide. This demonstrates that Defendants knew or should have known that symptoms, such as continuous and violent vomiting, can linger long after the drugs are discontinued and shows the need to warn of gastroparesis.

75. From the date Defendants received FDA approval to market Ozempic until the present time, Defendants made, distributed, marketed, and/or sold Ozempic without adequate warning to Plaintiff Rhonda Gidney's prescribing physician(s) and/or Plaintiff Rhonda Gidney that Ozempic was causally associated with and/or could cause gastroparesis.

76. Upon information and belief, Defendants knew or should have known of the causal association between the use of GLP-1 RAs and the risk of developing gastroparesis. Defendants' actual and constructive knowledge derived from their clinical studies, case reports, and the medical literature, including the medical literature and case reports referenced above in this Complaint.

77. Upon information and belief, Defendants ignored the causal association between the use of GLP-1 RAs and the risk of developing gastroparesis.

78. Defendants' failure to disclose information that they possessed regarding the causal association between the use of GLP-1 RAs and the risk of developing gastroparesis, rendered the warnings for this medication inadequate.

79. By reason of the foregoing acts and omissions, Plaintiff Rhonda Gidney was and still is caused to suffer from gastroparesis and/or worsening of gastroparesis and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

**F.  Allegations Specific to Plaintiff Rhonda Gidney**

80. Plaintiff, Rhonda Gidney, is a citizen and resident of Orleans, Vermont.

81. In or around March of 2020, Ms. Gidney was prescribed once weekly Ozempic injections to treat her Type 2 Diabetes. At that time, Plaintiff was a citizen and resident of Wrentham, Massachusetts.

82. Ms. Gidney was prescribed Ozempic by her treating provider at the Joslin Diabetes Center in Boston, Massachusetts beginning in March of 2020.

83. Ms. Gidney filled her prescription for Ozempic at Walgreens Pharmacy in Bellingham, Massachusetts.

84. Ms. Gidney administered her Ozempic injections at her former home in Wrentham, Massachusetts from March of 2020 through May of 2020.

85. Shortly after she began taking Ozempic, Ms. Gidney began to suffer from nausea and vomiting. She was initially placed on Zofran, but this caused her constipation so she was taken off that medication.

86. Near the end of May 2020, Ms. Gidney's medical providers at the Joslin Diabetes Center took her off Ozempic, and her nausea and vomiting improved.

87. Despite the improvement of her nausea and vomiting, in a tele-health visit on May 28,

2020, Ms. Gidney reported to her gastroenterologist, Dr. Ajay Batra at Milford Gastroenterology Associates, that she could still feel food getting stuck in the lower neck region, and sometimes she experienced symptoms of early satiety where she would vomit meals. While Ms. Gidney had not formally been diagnosed with gastroparesis at this time, Dr. Batra recommended a gastroparesis diet.

88. For the next three (3) years, Ms. Gidney continued to suffer from these symptoms, as well as intermittent nausea and vomiting.

89. On May 10, 2023, a Nuclear Gastric Emptying Study confirmed her diagnosis of gastroparesis with results showing markedly delayed gastric emptying. Ms. Gidney's calculated half-emptying time was equal to 566 minutes, where the normal half-emptying time is between the range of 45 to 140 minutes. At that time, Plaintiff was a citizen and resident of Wrentham, Massachusetts.

90. Ms. Gidney continues to treat with her gastroenterologist, Dr. Batra at Milford Gastroenterology Associates in Milford, Massachusetts.

91. As previously stated, there is no cure for gastroparesis.[48]

## EQUITABLE TOLLING OF STATUTE OF LIMITATIONS

92. Defendants willfully, wantonly, and intentionally conspired, and acted in concert, to withhold information from Plaintiff, Plaintiff's healthcare providers, and the general public concerning the known hazards associated with the use of Ozempic.

93. Defendants willfully, wantonly, and intentionally conspired, and acted in concert, to withhold safety-related warnings from the Plaintiff, and the general public concerning the known hazards associated with the use of Ozempic.

---

[48] *Gastroparesis*, Mayo Clinic (June 11, 2022), available at https://www.mayoclinic.org/diseases-conditions/gastroparesis/symptoms-causes/syc-20355787 (visited on 10/2/24).

94. Defendants willfully, wantonly, and intentionally conspired, and acted in concert, to represent that Ozempic was safe for treatment of diabetes and for weight loss when in fact, Defendant knew and/or should have known the product was not safe for those purposes.

95. Defendants willfully, wantonly, and intentionally conspired, and acted in concert to advertise, market, and recommend the use of Ozempic, while concealing and failing to disclose or warn of the dangers known by Defendants to be connected with, and inherent in, the use of Ozempic.

96. Defendants willfully, wantonly, and intentionally continued to manufacture and sell Ozempic with the knowledge that the product was unreasonably unsafe and dangerous.

97. Defendants willfully, wantonly, and intentionally conspired, and acted in concert, to ignore relevant safety concerns and to deliberately failed to use reasonable and prudent care in the design, research, testing, manufacture, and development of Ozempic so as to avoid the risk of serious harm associated with the product.

98. Defendants failed to disclose a known defect and, instead, affirmatively misrepresented that Ozempic was safe for its intended use. Defendants disseminated labeling, marketing, promotion and/or sales information to Plaintiff, her healthcare providers, and the general public regarding the safety of Ozempic knowing such information was false, misleading, and/or inadequate to warn of the safety risks associated with Ozempic use. Defendants did so willfully, wantonly, and with the intent to prevent the dissemination of information known to them concerning Ozempic's safety.

99. Further, Defendants actively concealed the true risks associated with the use of Ozempic by failing to disclose information that they possessed regarding the causal association between the use of Ozempic and the risk of developing gastroparesis.

100.     Due to the absence of any warning by the Defendants as to the significant health and safety risks posed by Ozempic use, Plaintiff was unaware that Ozempic could cause gastroparesis, as this danger was not known to Plaintiff, Plaintiff's healthcare providers, or the general public.

101.     Given Defendants' conduct and deliberate actions designed to deceive Plaintiff, Plaintiff's healthcare providers, and the general public, with respect to the safety and efficacy of Ozempic, Defendants are estopped from relying on any statute of limitations defenses.

102.     Plaintiff pleads that the discovery rule should be applied to toll the running of the statute of limitations until Plaintiff knew, or through the exercise of reasonable care and diligence should have known, of facts indicating that Plaintiff had been injured, the cause of the injury, and the tortuous nature of the wrongdoing that caused the injury. Despite diligent investigation by Plaintiff into the cause of her injuries, including consultations with Plaintiff's medical providers, the nature of Plaintiff's injuries and damages and their relationship to Ozempic were not discovered, and through reasonable care and due diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiff's claims.

103.     Defendants are estopped from asserting a statute of limitations defense because Defendants fraudulently concealed from Plaintiff the nature of Plaintiff's injuries and the connection between the injuries and Defendants' tortious conduct.

## CAUSES OF ACTION

### COUNT I:  NEGLIGENCE
### (AGAINST ALL DEFENDANTS)

104.     Plaintiff restates, realleges and incorporates by reference each and every allegation of

this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

105.    At all times relevant to this action, including prior to when Plaintiff's physician prescribed Plaintiff Ozempic and throughout the period of time that Plaintiff used Ozempic, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, advertised, marketed, overpromoted, distributed and/or sold Ozempic to physicians and/or consumers, such as Plaintiff, in the Commonwealth of Massachusetts and in the United States.

106.    At all times relevant to this action, including prior to when Plaintiff's physician prescribed Plaintiff Ozempic and throughout the period of time that Plaintiff used Ozempic, Defendants had a duty to exercise reasonable care in the in testing, studying, researching, designing, formulating, manufacturing, inspecting, labeling, packaging, promoting, advertising, marketing, distributing, and selling Ozempic to physicians and/or consumers, such as Plaintiff, in the Commonwealth of Massachusetts and in the United States.

107.    Defendants' duty to exercise reasonable care includes the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that did not cause users to suffer from unreasonable, dangerous side effects without an adequate warning whether the product is used alone or in foreseeable combination with other drugs.

108.    At all times relevant to this action, Defendants knew, or in the exercise of reasonable care, should have known of the hazards and dangers associated with Ozempic. Specifically, that the use of Ozempic could cause gastroparesis, gastroenteritis, malnutrition, intestinal obstruction, hospitalization, sarcopenia, and death.

109.  At all times relevant to this action, Defendants knew, or in the exercise of reasonable

care, should have known that the use of Ozempic could cause Plaintiff's injuries, and, thus, created a dangerous and unreasonable risk of injury to the users of these products of which Defendants did not warn.

110. Despite the fact that Defendants knew, or in the exercise of reasonable care, should have known of the dangerous and unreasonable risks of Ozempic use, Defendants continue to manufacture and market the product to the medical community and the public.

111. In disregard of their duties, Defendants committed one or more of the following negligent acts or omissions:

(a) Manufacturing, producing, overpromoting, marketing, formulating, creating, developing, designing, selling, and distributing Ozempic, without thorough and adequate pre- and post-market testing of the product;

(b) Manufacturing, producing, overpromoting, marketing, advertising, formulating, creating, developing, and distributing Ozempic, and upon information and belief, while negligently and intentionally concealing and failing to disclose clinical data which demonstrated the risk of serious harm associated with the use of Ozempic;

(c) Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Ozempic was safe for its intended use;

(d) Upon information and belief, failing to disclose and warn of the product defect to the regulatory agencies, the medical community, and consumers that Defendants knew and had reason to know that Ozempic was indeed unreasonably unsafe and unfit for use by reason of the product's defect and risk of harm to its users;

(e) Failing to warn Plaintiff, the medical and healthcare community, and consumers that Ozempic's risk of harm was unreasonable and that there were safer and effective alternative products available to Plaintiff and other consumers;

(f) Failing to provide adequate instructions, guidelines, and safety precautions to those persons to whom it was reasonably foreseeable would use Ozempic;

(g) Advertising, marketing, and recommending the use of Ozempic while concealing and failing to disclose or warn of the dangers known by Defendants to be connected with, and inherent in, the use of Ozempic;

(h) Representing that Ozempic was safe for weight loss when in fact Defendants knew and/or should have known the product was not safe for those purposes;

(i)  Continuing to manufacture and sell Ozempic with the knowledge that Ozempic, when used for weight loss, was unreasonably unsafe and dangerous;

(j)  Failing to use reasonable and prudent care in the design, research, testing, manufacture, and development of Ozempic so as to avoid the risk of serious harm associated with the use of the product;

(k)  Failing to design and manufacture Ozempic so as to ensure the drug was at least as safe and effective as other similar products;

(l)  Failing to ensure that Ozempic was accompanied by proper and accurate warnings about the risk of severe gastrointestinal problems including gastroparesis;

(m)  Failing to ensure that Ozempic was accompanied by proper and accurate warnings about possible adverse side effects associated with the use of Ozempic and that use of Ozempic created a high risk of severe injuries; and

(n)  Failing to conduct adequate testing, including pre-clinical and clinical testing, and post-marketing surveillance to determine the safety of Ozempic.

112.    A reasonable manufacturer, designer, distributor, promotor, or seller under the same or similar circumstances would not have engaged in the aforementioned acts and omissions.

113.    As a direct and proximate result of Defendants' negligent testing, monitoring, and pharmacovigilance of Ozempic, Defendants introduced a drug into the Commonwealth of Massachusetts that they knew or should have known would cause serious and severe gastrointestinal issues in people including gastroparesis, an incurable condition, and Plaintiff has been injured catastrophically and sustained severe and permanent bodily injuries. She has been forced to endure pain, suffering, and impairment, loss of enjoyment of life, loss of care, comfort, and medical expenses and other economic damages.

114.    As a result of the foregoing acts and omissions, Plaintiff Rhonda Gidney requires and/or will require future health care and services and did incur medical, health, incidental, and related expenses. Plaintiff Rhonda Gidney is informed and believes and

further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

115.    By reason of the foregoing, Plaintiff seeks compensatory damages, both past and future, statutory damages, attorney's fees and costs, and all other available remedies provided to Plaintiff under the law as a result of her injuries.

## COUNT II:  PRODUCTS LIABILITY – FAILURE TO WARN
### (AGAINST ALL DEFENDANTS)

116.    Plaintiff restates, realleges and incorporates by reference each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

117.    Under Massachusetts law, a product is defective if the manufacturer fails to give effective warnings of the product's dangers that were known or should have been known, or fails to give adequate instructions to avoid such dangers, which failure rendered the product unreasonably dangerous as marketed, meaning that the product was dangerous to an extent beyond that which would be contemplated by the ordinary user of the product with the ordinary knowledge common to the community as to the product's characteristics.

118.    Defendants failed to properly and adequately warn and instruct Plaintiff and her health care providers as to the dangers and risks associated with use of Ozempic. Defendants failed to properly package or label their products to give reasonable warnings of danger about Ozempic to Plaintiff and her health care providers.

119.    Defendants were reckless in their failure to warn Ms. Gidney and her doctor(s) regarding adverse reactions that were known at the time Ms. Gidney was prescribed and injected with their Ozempic product.

120.    Defendants had a duty to warn Plaintiff, Plaintiff's physicians, and consumers of Ozempic of the known and/or knowable dangers and serious side effects, including that that Ozempic posed a significant risk of gastroparesis, gastroenteritis, intestinal obstruction, malnutrition, hospitalization, and death and deliberately proceeded to act, or failed to act, in conscience disregard of, or indifference to, that risk.

121.    Defendants, as manufacturers, distributers, and marketers of pharmaceutical drugs, are held to the level of knowledge of an expert in the field, and further, Defendants knew or should have known based on information that was available and generally accepted in the scientific community that warnings and other clinically relevant information and data which they distributed regarding the risks associated with the use of Ozempic were inadequate.

122.    Defendants did not provide an adequate warning regarding the side effects of Ozempic at the time Plaintiff was prescribed and injected with the brand-name medication.

123.    The label for Ozempic is inadequate because it did not warn and/or adequately warn of all possible adverse side effects associated with the use of Ozempic, including the increased risk of severe gastrointestinal events (e.g., gastroparesis, gastroenteritis, intestinal blockage, and malnutrition) and the need to permanently stay on the drug or the weight will be regained.

124.    The label for Ozempic is inadequate because it did not contain adequate instructions for use such that a physician and patient could make an informed prescribing decision, adequately monitor the patient while using, and mitigate potential harms from the use of Ozempic.

125.    The label for Ozempic is inadequate because it did not warn and/or adequately warn that Ozempic had not been sufficiently and/or adequately tested for safety risks, including severe

gastrointestinal events (e.g., gastroparesis, gastroenteritis, intestinal blockage, and malnutrition).

126. The label for Ozempic is inadequate because it did not warn and/or adequately warn of all possible adverse side effects concerning the failure and/or malfunction of Ozempic.

127. The label for Ozempic is inadequate because it did not warn and/or adequately warn of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects.

128. Communications made by Defendants to Plaintiff and her prescribing physician(s) were inadequate because Defendants failed to warn and/or adequately warn of all possible adverse side effects associated with the use of Ozempic, including the increased risk of severe gastrointestinal events (e.g., gastroparesis, gastroenteritis, intestinal blockage, and malnutrition).

129. Communications made by Defendants to Plaintiff and her prescribing physician(s) were inadequate because Defendants failed to warn and/or adequately warn that Ozempic had not been sufficiently and/or adequately tested for safety risks, including severe gastrointestinal events (e.g., gastroparesis and gastroenteritis, intestinal blockage, and malnutrition).

130. Defendants acted or intentionally failed to act—in breach of their duty to Plaintiff regarding warning of the risks associated with Ozempic—knowing or having reason to know of facts which would lead a reasonable person to realize, not only that his or her conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

131. Plaintiff and Plaintiff's treating physicians did not have the same knowledge as Defendants and no adequate warning or other clinically relevant information or data was communicated to Plaintiff or to Plaintiff's treating physicians.

132. Defendants had and continue to have a duty to provide adequate warnings and

instructions for Ozempic, to use reasonable care to design a product that is not unreasonably

dangerous to users, and to adequately understand, test, and monitor their product.

133.    Defendants had and continue to have a duty to provide consumers, including Plaintiff

and Plaintiff's physicians, with warnings and other clinically relevant information and data

generally accepted within the scientific community regarding the risks and dangers associated

with Ozempic, as it became or could have become available to Defendants.

134.    At all times material herein, Defendants acted with reckless disregard and knew, or in

the exercise of reasonable care should have known, that Ozempic had inadequate instructions

and/or warnings.

135.    Each of the following acts and omissions herein alleged was negligently and

carelessly performed by Defendants, resulting in a breach of the duties set forth above. These

acts and omissions include, but are not restricted to:

(a) Failing to properly and adequately warn and instruct Plaintiff and Plaintiff'
treating physicians that Ozempic was designed and/or manufactured in a way that
it could cause injuries and damages, including lasting and permanent
gastrointestinal injuries;

(b) Failing to timely disclose to Plaintiff and Plaintiff' treating physicians the risks of
gastrointestinal injuries, including gastroparesis and intestinal obstruction,
associated with Ozempic in the product's labeling;

(c) Failing to timely warn Plaintiff and Plaintiff's treating physicians that a detailed
lab work and patient history should be obtained before starting Ozempic.

136.    Defendants knew or should have known of the risk and danger of serious bodily harm

from the use of Ozempic but failed to provide an adequate warning to patients and prescribing

physicians for the product, including Plaintiff and Plaintiff's prescribing physicians, despite

knowing the product could cause serious injury.

137.    Plaintiff was prescribed and used Ozempic for its intended purpose.

138.    Plaintiff could not have known about the dangers and hazards presented by Ozempic.

139.    The warnings given by Defendants were not accurate, clear, or complete, and/or were ambiguous.

140.    The warnings, or lack thereof, that were given by Defendants failed to properly warn prescribing physicians, including Plaintiff's prescribing physician, of the known and knowable risk of serious and potentially irreversible injuries related to the development of gastrointestinal injuries, including gastroparesis and intestinal obstruction, and failed to instruct prescribing physicians to test and monitor for the presence of the injuries and to discontinue use when symptoms of gastroparesis manifest.

141.    The warnings that were given by the Defendants failed to properly warn Plaintiff and prescribing physicians of the prevalence of gastroparesis and sequelae related thereto.

142.    Plaintiff and Plaintiff's prescribing physicians reasonably relied upon the skill, superior knowledge, and judgment of Defendants. Defendants had a continuing duty to warn Plaintiff and prescribing physicians of the dangers associated with Ozempic. Had Plaintiff received adequate warnings regarding the risks of Ozempic, Plaintiff would not have used the product.

143.    Defendants' reckless disregard for the information disseminated regarding the dosing information, marketing, testing, and warnings of Ozempic was a proximate cause of Plaintiff's injuries and damages.

144.    The risk of gastroparesis was reasonably foreseeable at the time of sale and could have been discovered by way of reasonable testing prior to marketing the product. Defendants recklessly failed to conduct such reasonable testing.

145.    Defendants intentionally failed to inform the public, including Plaintiff and her physician, of the risk of gastroparesis with use of Ozempic.

146.    Instead, Defendants chose to over-promote the safety, efficacy, and benefits of the Products.

147.    Had Plaintiff known the true facts about the dangers and serious health and/or safety risks of Ozempic, she would not have purchased, used, consented to, or relied on the information given regarding Ozempic.

148.    As a consequence of Defendants' misconduct, Plaintiff's physicians lacked adequate warnings and other appropriate facts that were misrepresented or omitted from the information (if any) that Defendants provided to physicians for Ozempic.

149.    As a direct, foreseeable and proximate result of Defendants' failure to warn of the significant risks associated with Ozempic, Plaintiff has been injured catastrophically and sustained severe and permanent bodily injuries. She has been forced to endure pain, suffering, and impairment, loss of enjoyment of life, loss of care, comfort, and medical expenses and other economic damages.

150.    As a result of the foregoing acts and omissions, Plaintiff Rhonda Gidney requires and/or will require future health care and services and did incur medical, health, incidental, and related expenses. Plaintiff Rhonda Gidney is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

151.    By reason of the foregoing, Plaintiff seeks compensatory damages, both past and future, statutory damages, attorney's fees and costs, and all other available remedies provided to Plaintiff under the law as a result of her injuries.

**COUNT III:  PRODUCTS LIABILITY – DESIGN DEFECT**
**(AGAINST ALL DEFENDANTS)**

152.    Plaintiff restates, realleges and incorporates by reference each and every allegation of

this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

153.    Under Massachusetts law, to demonstrate a product is defectively designed, a plaintiff must show that the product in question was made according to an unreasonably dangerous design and does not meet a consumer's reasonable expectation as to its safety.

154.    Plaintiff, ordinary consumers, and prescribers would not expect a contraceptive drug designed, marketed, and labeled for contraception to cause intracranial meningioma.

155.    The Ozempic injections supplied to Plaintiff by Defendants were defective in design or formulation in that, when it left the hands of the manufacturer or supplier, it had not been adequately tested, was in an unreasonably dangerous and defective condition, provided an excessive dose for its purpose and posed a risk of the development of serious gastrointestinal injuries, including but no limited to gastroparesis and intestinal obstruction, to Plaintiff and other consumers.

156.    The Ozempic supplied to Plaintiff by Defendants was defective in design or formulation in that its effectiveness as a medication to treat diabetes and promote weight loss did not outweigh the risks of the development of serious gastrointestinal injuries posed by the drug. In light of the utility of the drug and the risk involved in its use, the design of the Ozempic drug makes the product unreasonably dangerous.

157.    Ozempic's design is more dangerous than a reasonably prudent consumer would expect when used in its intended or reasonably foreseeable manner. It was more dangerous than Plaintiff expected.

158.    Feasible and suitable alternative designs have existed at all relevant times relevant as compared to Defendants' Ozempic, including but not limited to alternate dosing, reduced

exposure, among others.

159.    At all relevant times to this lawsuit, Defendants owed a duty to consumers including Plaintiff and their health care providers, to assess, manage, and communicate the risks, dangers, and adverse effect inherent in the use of Ozempic. Defendants' duties included, but were not limited to, carefully and properly designing, testing, studying, and manufacturing Ozempic.

160.    Defendants negligently and carelessly breached the above-described duties to Plaintiff by, among other acts and omissions, negligently and carelessly:

 (a)  Failing to use ordinary care in designing, testing, and manufacturing Ozempic;

(b)  Failing to design Ozempic as to properly minimize the adverse effects to the gastrointestinal and immune system;

(d)  Failing to counteract in the design the known adverse effects on the gastrointestinal and immune system;

(e)  Designing a product where the benefits were greatly outweighed by the risks gastroparesis, gastroenteritis, intestinal obstruction, malnutrition, hospitalization, and death.

161.    Furthermore, Ozempic was defective in design or formulation in that, when it left the hands of the manufacturers and/or suppliers and/or distributors, the foreseeable risks exceeded the benefits associated with the design or formulation.

162.    At all reasonable times, given its lack of efficacy and increased safety risks, Ozempic did not meet the reasonable expectations of an ordinary consumer, particularly the Plaintiff, or in the alternative, her medical providers.

163.    Ozempic was defective in design or formulation in that, when it left the hands of the manufacturers and/or suppliers and/or distributors, it was unreasonably dangerous, more dangerous than an ordinary consumer would expect, and more dangerous than other similar drugs.

164.    Despite Defendants' knowledge of the foreseeable risks and unreasonably dangerous nature of Ozempic at all times relevant, Defendants designed and brought the product to market and continued to market the drug when there were safer alternatives available, including but not limited to alternate dosing, reduced exposure, among others.

165.    Defendants' recklessness and Ozempic's failures arise under circumstances precluding any other reasonable inference other than a defect in Ozempic.

166.    At all times material herein, Defendants had a duty to exercise reasonable care and had the duty of an expert in all aspects of the design, formulation, manufacture, compounding, testing, inspection, packaging, labeling, distribution, marketing, promotion, advertising, sale, testing, and research to assure the safety of Ozempic when used as intended or in a way that Defendants could reasonably have anticipated, and to assure that the consuming public, including Plaintiff and Plaintiff's physicians, obtained accurate information and adequate instructions for the safe use or non-use of Ozempic.

167.    At all times material herein, Defendants failed to exercise reasonable care and the duty of an expert and knew, or in the exercise of reasonable care should have known, that Ozempic was not properly manufactured, designed, compounded, tested, inspected, packaged, distributed, marketed, advertised, formulated, promoted, examined, maintained, sold, prepared, or a combination of these acts.

168.    Defendants' failure to exercise reasonable care in the design, dosing information, marketing, warnings, and/or manufacturing of Ozempic was a proximate cause of Plaintiff's injuries and damages.

169.    Defendants' reckless disregard for the design of Ozempic was a proximate cause of Plaintiff's injuries and damages.

170.    The risk of the development of serious gastrointestinal injuries, including but not limited to gastroparesis, was reasonably foreseeable at the time of sale and could have been discovered by way of reasonable testing prior to marketing the product. Defendants recklessly failed to conduct such reasonable testing.

171.    As a result of Defendants' negligent and reckless design, Plaintiff sustained severe and ongoing injuries.

172.    As a direct and proximate result of Defendants' negligence, Plaintiff has been injured catastrophically and sustained severe and permanent bodily injuries. She has been forced to endure pain, suffering, and impairment, loss of enjoyment of life, loss of care, comfort, and medical expenses and other economic damages.

173.    As a result of the foregoing acts and omissions, Plaintiff Rhonda Gidney requires and/or will require future health care and services and did incur medical, health, incidental, and related expenses. Plaintiff Rhonda Gidney is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

174.    By reason of the foregoing, Plaintiff seeks compensatory damages, both past and future, statutory damages, attorney's fees and costs, and all other available remedies provided to Plaintiff under the law as a result of her injuries.

### COUNT IV:  NEGLIGENT MISREPRESENTATION
### (AGAINST ALL DEFENDANTS)

175.    Plaintiff restates, realleges and incorporates by reference each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

176.    At all relevant times, Defendants negligently provided Plaintiff, her healthcare

providers, the general medical community, and the public with false, fraudulent, and/or incorrect information or omitted or failed to disclose material information concerning Ozempic, including, but not limited to, misrepresentations and marketing regarding the safety, known risks, and long-term effects Ozempic.

177.    The information distributed by Defendants to Plaintiff, her healthcare providers, the general medical community, and the public, including advertising campaigns, labeling materials, print advertisements, commercial media, and marketing was false and misleading and contained omissions and concealment of truth about the dangers of Ozempic.

178.    Defendants' conduct had the capacity to deceive and/or purpose in making these misrepresentations was to deceive and defraud the public and the medical community, including Plaintiff and Plaintiff's health care providers; to falsely assure them of the quality of Ozempic and induce the public and medical community, including Plaintiff and Plaintiff's healthcare providers to request, recommend, purchase, and prescribe Ozempic.

179.    Defendants had a duty to accurately and truthfully represent and market to the medical and healthcare community, medical pharmaceutical manufacturers, Plaintiff, her healthcare providers and the public, the known risks of Ozempic, including its propensity to cause gastroparesis, gastroenteritis, intestinal blockage/obstruction, and malnutrition, as well as that fact weight lost will be regained upon cessation of the drug. Defendants made continued omissions in the Ozempic labeling, including promoting it as safe and effective while failing to warn of its propensity to cause gastroparesis, gastroenteritis, intestinal blockage/obstruction, and malnutrition.

180.    Defendants made additional misrepresentations beyond the product labeling by representing Ozempic as a safe and effective treatment for diabetes and weight- loss with only

minimal risks.

181.    Defendants misrepresented and overstated the benefits of Ozempic to Plaintiff, Plaintiff's treaters, and the medical community without properly advising of the known risks to patients.

182.    Defendants made the misrepresentations alleged herein with the intent to induce consumers, like Plaintiff, to take Ozempic, and to induce health care providers to prescribe Ozempic.

183.    In reliance upon the false, deceptive and negligent misrepresentations and omissions and marketing made by Defendants, Plaintiff and Plaintiff's healthcare providers were induced to, and did use and prescribe Ozempic.

184.    In reliance upon the affirmative misrepresentations and/or negligent omissions made by Defendants, Plaintiff and Plaintiff's healthcare providers were induced to, and did use and prescribe Ozempic.

185.    As a direct and proximate result of the foregoing negligent misrepresentations and marketing and conduct with capacity to deceive and/or intention to deceive, Plaintiff suffered serious and ongoing injuries.

186.    As a direct and proximate result of the foregoing misrepresentations, marketing, and deceitful intentions, Plaintiff requires and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

187.    Defendants knew or should have known that Plaintiff, Plaintiff's healthcare providers, and the general medical community did not have the ability to determine the true material facts which were intentionally and/or negligently concealed and misrepresented by Defendants.

188.    Defendants had sole access to many of the material facts concerning the defective

nature of Ozempic and its propensity to cause serious and dangerous side effects.

189.    At the time Plaintiff was prescribed and administered Ozempic, Plaintiff and Plaintiff's healthcare providers were unaware of Defendants' negligent misrepresentations and omissions.

190.    Plaintiff and her healthcare providers would not have used or prescribed Ozempic had the true facts not been concealed by Defendants.

191.    Defendants failed to exercise ordinary care in making representations concerning Ozempic while they were involved in their manufacture, design, sale, testing, quality assurance, quality control, promotion, marketing, labeling, and distribution in interstate commerce, because Defendants negligently misrepresented Ozempic's high risk of unreasonable and dangerous adverse side effects. Plaintiff and Plaintiff's healthcare providers reasonably relied upon these misrepresentations and omissions made by Defendants, where the concealed and misrepresented facts were critical to understanding the true and full dangers inherent in the use of Ozempic. Plaintiff and Plaintiff's healthcare providers' reliance on the foregoing misrepresentations and omissions was the direct and proximate cause of Plaintiff' injuries.

192.    As a direct and proximate result of Defendants' false, deceptive and negligent misrepresentations and omissions, Plaintiff has been injured catastrophically and sustained severe and permanent bodily injuries. She has been forced to endure pain, suffering, and impairment, loss of enjoyment of life, loss of care, comfort, and medical expenses and other economic damages.

193.    As a result of the foregoing negligent misrepresentations and omissions, Plaintiff Rhonda Gidney requires and/or will require future health care and services and did incur medical, health, incidental, and related expenses. Plaintiff Rhonda Gidney is informed and

believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

194.    By reason of the foregoing, Plaintiff seeks compensatory damages, both past and future, statutory damages, attorney's fees and costs, and all other available remedies provided to Plaintiff under the law as a result of her injuries.

### COUNT V:  BREACH OF EXPRESS WARRANTY (M.G.L. Ch. 106 § 2-313) (AGAINST ALL DEFENDANTS)

195.    Plaintiff restates, realleges and incorporates by reference each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

196.    At all relevant times herein, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic, and placed it into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

197.    Plaintiff and/or her prescribing physicians were at all relevant times in privity with Defendants.

198.    Defendants expressly warranted to Plaintiff, Plaintiff's physicians, and the general public, by and through Defendants and/or their authorized agents or sales representatives, in publications, labeling, the internet, and other communications intended for physicians, patients, Plaintiff, and the general public, that Ozempic was safe, effective, fit and proper for its intended use.

199.    Ozempic materially failed to conform to those representations made by Defendants,

in package inserts and otherwise, concerning the properties and effects of Ozempic, which Plaintiff purchased and consumed via injection in direct or indirect reliance upon these express representations. Such failures by Defendants constituted a material breach of express warranties made, directly or indirectly, to Plaintiff concerning Ozempic as sold to Plaintiff.

200.    Defendants expressly warranted that Ozempic was safe and well-tolerated. However, Defendants did not have adequate proof upon which to base such representations, and, in fact, knew or should have known that Ozempic was dangerous to the well-being of Plaintiff and others.

201.    Ozempic does not conform to those express representations because it is defective, is not safe, and has serious adverse side effects.

202.    Defendants' Ozempic was expected to reach and did in fact reach consumers, including Plaintiff and her prescribing physicians, without substantial change in the condition in which it was manufactured and sold by Defendants.

203.    Defendants breached various express warranties with respect to Ozempic including the following particulars:

a)  Defendants represented to Plaintiff and her physicians and healthcare providers through their labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory submissions that Ozempic was safe and fraudulently withheld and concealed information about the substantial risks of serious injury associated with being injected with Ozempic;

b)  Defendants intentionally omitted information regarding feasible and suitable alternative designs to Defendants' Ozempic, including but not limited to alternate dosing, reduced exposure, among others.

c)  Defendants represented to Plaintiff and her physicians and healthcare providers that Ozempic was as safe, and/or safer than other alternative procedures and devices and fraudulently concealed information, which demonstrated that Ozempic was not safer than alternatives available on the market; and

d)  Defendants represented to Plaintiff and her physicians and healthcare providers that Ozempic was more efficacious than other alternative medications and fraudulently concealed information, regarding the true efficacy of Ozempic.

204.    Plaintiff's physicians justifiably relied on Defendants' representations through
Defendants' marketing and sales representatives in deciding to prescribe Ozempic over other
alternative treatments on the market, and Plaintiff justifiably relied on Defendants' representations
in deciding to purchase and use the drug.

205.    Plaintiff purchased and ingested Ozempic without knowing that the drug is not safe
and well-tolerated, but that Ozempic instead causes significant and irreparable damage through the
development of severe gastrointestinal injuries, including but not limited to gastroparesis,
gastroenteritis, intestinal blockage/obstruction, and malnutrition.

206.    As a direct and proximate result of Defendants' breaches of warranty, Plaintiff has
been injured catastrophically and sustained severe and permanent bodily injuries. She has been
forced to endure pain, suffering, and impairment, loss of enjoyment of life, loss of care, comfort,
and medical expenses and other economic damages.

207.    As a result of the foregoing breaches of warranty, Plaintiff Rhonda Gidney requires
and/or will require future health care and services and did incur medical, health, incidental, and
related expenses. Plaintiff Rhonda Gidney is informed and believes and further alleges that
Plaintiff will require future medical and/or hospital care, attention, and services.

208.    By reason of the foregoing, Plaintiff seeks compensatory damages, both past and
future, statutory damages, attorney's fees and costs, and all other available remedies provided to
Plaintiff under the law as a result of her injuries.

## COUNT VI:  BREACH OF IMPLIED WARRANTY (M.G.L. Ch. 106 § 2-314)
## (AGAINST ALL DEFENDANTS)

209.    Plaintiff restates, realleges and incorporates by reference each and every allegation of
this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and

effect as if more fully set forth herein.

210.    At all relevant times herein, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic, and placed it into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

211.    The risk of the development of severe gastrointestinal injuries, including but not limited to gastroparesis, was reasonably foreseeable at the time of sale and could have been discovered by way of reasonable testing prior to marketing the product. Defendants failed to conduct such reasonable testing.

212.    Plaintiff and/or her physicians were at all relevant times in privity with Defendants.

213.    Defendants were the sellers of the Ozempic and sold Ozempic to be taken to control blood sugar in adults with type 2 diabetes and to promote weight loss, among other indications. Plaintiff was prescribed and purchased Ozempic for its intended purposes.

214.    When the Ozempic was prescribed by Plaintiff's physicians and taken by Plaintiff, the product was being prescribed and used for the ordinary purpose for which it was intended.

215.    Defendants impliedly warranted their Ozempic product, which they manufactured and/or distributed and sold, and which Plaintiff purchased and ingested, to be of merchantable quality and fit for the common, ordinary, and intended uses for which the product was sold.

216.    Defendants' Ozempic was expected to reach and did in fact reach consumers, including Plaintiff and her prescribing physicians, without substantial change in the condition in which it was manufactured and sold by Defendants.

217.    Defendants breached various express warranties with respect to Ozempic including

the following particulars:

    a)  Defendants represented to Plaintiff and her physicians and healthcare providers through their labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory submissions that Ozempic was safe and fraudulently withheld and concealed information about the substantial risks of serious injury associated with being injected with Ozempic;

    b)  Defendants represented to Plaintiff and her physicians and healthcare providers that Ozempic was as safe, and/or safer than other alternative procedures and devices and fraudulently concealed information, which demonstrated that Ozempic was not safer than alternatives available on the market; and

    c)  Defendants represented to Plaintiff and her physicians and healthcare providers that Ozempic was more efficacious than other alternative medications and fraudulently concealed information, regarding the true efficacy of Ozempic.

218.    Defendants breached their implied warranties of the Ozempic product because the Ozempic sold to Plaintiff was not fit for its ordinary purpose as a medication that is used to control blood sugar in adults with type 2 diabetes and promote weight loss, safely and effectively, among other uses.

219.    Ozempic would not pass without objection in the trade; is not of fair average quality; is not fit for its ordinary purposes for which the product is used; was not adequately contained, packaged and labeled; and fails to conform to the promises or affirmations of fact made on the container or label.

220.    Defendants' breach of their implied warranties resulted in the administration of the unreasonably dangerous and defective product into Plaintiff, which placed Plaintiff's health and safety at risk and resulted in the damages alleged herein.

221.    As a direct and proximate result of reliance upon Defendants' breaches of warranty, Plaintiff has been injured catastrophically and sustained severe and permanent bodily injuries. She

has been forced to endure pain, suffering, and impairment, loss of enjoyment of life, loss of care, comfort, and medical expenses and other economic damages.

222.     As a result of the foregoing breaches of warranty, Plaintiff Rhonda Gidney requires and/or will require future health care and services and did incur medical, health, incidental, and related expenses. Plaintiff Rhonda Gidney is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

223.     By reason of the foregoing, Plaintiff seeks compensatory damages, both past and future, statutory damages, attorney's fees and costs, and all other available remedies provided to Plaintiff under the law as a result of her injuries.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Rhonda Gidney respectfully requests that the Court:

1.     Award Plaintiff compensatory damages in an amount to be determined at trial, and also including, but not limited to:

    a.     General Damages for severe physical pain, mental suffering for severe and permanent personal injuries sustained by Plaintiff, as well as for the inconvenience, and loss of the enjoyment of life;

    b.     Special Damages, including all expenses, incidental past and future expenses, medical expenses, and loss of earnings and earning capacity;

2.     Award pre-judgment and post-judgment interest, as permitted by law;

3.     Award reasonable attorneys' fees and costs, as provided for by law; and

4.     Grant such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all Counts and as to all issues.

Dated:  June 30, 2025

RESPECTFULLY SUBMITTED,

*/s/ Julie E. Lamkin*
Julie E. Lamkin (MA BBO# 680482)
JEFFREY GLASSMAN INJURY
LAWYERS
One International Place, Suite 1810
Boston, MA 02110
TELEPHONE:  (617) 777-7777
FAX:  (617) 722-9999
jlamkin@jeffreysglassman.com

*Attorney for Plaintiff*